UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

LAMONT ALEXANDER DEAN,

        Petitioner,

  v.

CHERYL PLILER, Warden, et al.,

        Respondents.

NO. CIV. S-03-987 LKK/GGH P

O R D E R

Petitioner, a state prisoner proceeding through counsel, has filed this application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1999 conviction for attempted murder, assault with a firearm, second degree robbery and attempted second degree robbery.  Petitioner is currently serving forty years and ten months to life.  This matter was referred to the magistrate judge pursuant to 28 U.S.C. § 636(b)(1).  On August 20, 2004, the magistrate judge issued findings and recommendations herein which were served on all parties and which contained notice that any objections were to be filed within twenty days.

1  Petitioner timely filed his objections.

2      The district court reviews <u>de novo</u> those portions of the
3  proposed findings of fact to which objections have been made, 28
4  U.S.C. § 636(b)(1)(c); <u>McDonnell Douglas Corp. v. Commodore</u>
5  <u>Business Machines, Inc.</u>, 656 F.2d 1309, 1313 (9th Cir. 1981), <u>cert.</u>
6  <u>denied</u>, 455 U.S. 920 (1982), and the magistrate judge's conclusions
7  of law.  <u>Barilla v. Ervin</u>, 886 F.2d 1514, 1518 (9th Cir. 1989)
8  (citing <u>Britt v. Simi Valley Unified School Dist.</u>, 708 F.2d 452,
9  454 (9th Cir. 1983)).  The court may, however, assume the
10 correctness of that portion of the proposed findings of fact to
11 which no objection has been made and decide the motion on
12 applicable law. See <u>United States v. Remsing</u>, 874 F.2d 614, 617
13 (9th Cir. 1989)(citing <u>Orand v. United States</u>, 602 F.2d 207, 208
14 (9th Cir. 1979)).

15     The court is not bound to adopt the magistrate judge's
16 findings and recommendation; on the contrary, the court must
17 exercise "sound judicial discretion" in making its own
18 determination on the record. <u>United States v. Raddatz</u>, 447 U.S.
19 at 675-76.  The court may accept, reject, or modify, in whole or
20 in part, the magistrate judge's findings and recommendations.
21 28 U.S.C. § 636(b)(1)(c); <u>United States v. Remsing</u>, 874 F.2d at
22 617.  Having carefully reviewed the file, the court declines to
23 adopt the magistrate judge's findings and recommendations and makes
24 the following determinations based on the record.
25 ////
26 ////

**A.   BACKGROUND**

In this court petitioner challenges the admission of certain evidence admitted in his trial. In his direct appeal petitioner argued that admission of these out-of-court statements violated state law as well as the Confrontation Clause. Answer, Ex. 5. The California Court of Appeal did not address the Confrontation Clause claim, instead finding the admission of the testimony in question to be a violation of the California Evidence Code § 1230. It held, however, that the admission was harmless error. Answer, Ex. 8, p. 5. Petitioner raised the same claims in his petition for review filed with the California Supreme Court. Answer, Ex. 9. The California Supreme Court denied the petition for review without opinion. Answer, Ex. 10. Petitioner did not file a habeas corpus petition in state court.

The Antiterrorism and Effective Death Penalty Act (AEDPA) "worked substantial changes to the law of habeas corpus," establishing a deferential standard of review to be applied by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997). In particular, 28 U.S.C. § 2254(d) provides,

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

1  (2) resulted in a decision that was based on an
2  unreasonable determination of the facts in light of the
   evidence presented in the state court proceedings.

3  Ordinarily in a review under the AEDPA, the federal court
4  looks through unexplained decisions to the last reasoned decision
5  as the basis for the state court's judgment. Gill v. Ayers, 342
6  F.2d 911, 917 n. 5 (9th Cir. 2003). In the matter at bar,
7  however, there is no reasoned state court decision addressing
8  petitioner's Confrontation Clause claim. Under such circumstances
9  an independent review of the record is the only means of deciding
10 whether the state court's decision was objectively reasonable.
11 Greene v. Lambert, 288 F.3d 1081, 1088 (9th Cir. 2002) (citing
12 Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000)); Riggs v.
13 Fairman, 399 F.3d 1179, 1182 (9th Cir. 2005). Accordingly, below
14 the court undertakes an independent review of the record on
15 petitioner's Confrontation Clause claim.

**B.    TESTIMONY PRESENTED AT TRIAL**

    **1.    Ted White**

Ted White testified that on the night of July 14, 1998, he and Guy Woodrow, a.k.a. Scooty, sought to buy methamphetamine. RT at 61, 64, 131. Witnesses described White as a heavy-set white man with tattoos. RT at 176. White described Woodrow as approximately 6 feet tall, African American, balding on top and weighing about 240 pounds. RT at 61. In pursuit of their objective White and Woodrow drove to some apartments in north Vallejo near Jenai's Market where one Todd Dillard lived. RT at 61. They met Dillard and gave him $400 or $500 with the understanding that he would

return in a half hour with methamphetamine. RT at 62, 88.

White testified that after two hours elapsed and Dillard had not returned, they drove to 222 Wilson in White's van with a man named Jimmy. RT at 62-63. When they arrived, they saw Dillard who told them that someone else had the money and would be returning with the drugs. RT at 63-64.

At some point, Dillard and Woodrow went inside 222 Wilson while White waited outside in the van. RT at 64. White saw two African American men drive up. RT at 64. One of these men had dreadlocks. RT at 92. The two men began beating on the door, which opened. RT at 64. White followed them inside, RT at 64, while Jimmy stayed in the van. RT at 99. White followed them into an office area. RT at 66. White testified that in the office at that time were a total of six people: White, Woodrow, Dillard, a Hawaiian looking man, and the two African American men he had followed in. RT at 74, 93. On cross-examination, White testified that the men he followed in had nothing to do with the shooting. RT at 85.

White testified that at some point, another African American man arrived and handed Woodrow a bag of methamphetamine. RT at 93, 94. The person with the methamphetamine was a fairly dark skinned African American, 5'6" or 5'7", wearing a big puffy coat. RT at 67-68. On cross-examination White testified that this man was actually 5'2" or 5'3". RT at 97-98. Woodrow told White that they were going to give him a quarter ounce of methamphetamine for $400.00. RT at 64. White protested that this was not enough. RT

5

at 64.

White told the man in the puffy coat that the deal was not going to happen. RT at 68. At this point, the man in the puffy coat began talking to the Hawaiian man. RT at 68. After their discussion, the man in the puffy coat displayed a weapon and stated, "You guys must be cops. Give me your wallets on chains, you must be cops." RT at 69. White then gave him his wallet. RT at 70. The man then asked Woodrow for his wallet. RT at 71. Woodrow started moving and White saw the gun come up toward Woodrow's head. RT at 72. White then heard a shot and started running (though the testimony indicates he may have started moving or getting up before the shot). RT at 72, 96-97. White did not see the man actually pull the trigger. RT at 75. Woodrow was shot in the right side of his face. RT at 111.

On July 16, 1998, White was shown a photographic line-up. RT at 78, 79. White pointed to photograph nos. 2 and 6 and said that they were there. RT at 316. He said that no. 6 was not the shooter. RT at 316. Charles McClough, a.k.a. Boo, was in picture number 6. RT at 313-314. Petitioner was in photo no. 3. RT at 314. After Officer Coelho asked White if no. 3 could have been the shooter, White said that either the person in no. 1 or no. 3 could have been the shooter. RT at 316. He then said he thought the shooter was in photo no. 1. RT at 316.

About one year after the incident, White went to a live line-up and was unable to identify anyone in the line-up as the shooter. RT at 78. At trial, White was unable to identify petitioner as the

man who shot Woodrow.  RT at 77.

Officer Coelho interviewed White on July 15, 1998.  RT at 303. White initially told him that he ended up at 222 Wilson because he and Wilson had met a man at the Short Stop grocery store who offered to sell them parts for his van.  RT at 304.  White told him that after going into the building, he and Woodrow were robbed by some black males and Woodrow was shot.  RT at 304.

### 2. **Guy Woodrow**

Woodrow's version of events differed from White's version. Woodrow testified that no one named Jimmy went with them to 222 Wilson.  RT at 169, 159, 173-174.  When they got to 222 Wilson, they banged on the door and Dillard opened it and came outside. RT at 160.  Dillard went back inside the building then came out again.  RT at 161.  Dillard told them he did not know how long it was going to be and went back inside.  RT at 161.  White and Woodrow went and sat in the van. RT at 161.

Twenty minutes later, a white car pull up outside 222 Wilson. RT at 134, 161.  Two men got out of the car and went inside.  RT at 134.  One man was white and the other was Mexican.  RT at 137, 161-162.  Woodrow testified that he, White and Dillard followed the men inside.  RT At 134.  However, he also later testified that only Dillard went inside with them, and then later came out and told Woodrow and White to come inside.  RT at 134, 162.  Inside, Woodrow saw the heavy-set Mexican man and the white man .  RT at 135, 162. Woodrow talked to the Mexican man about the drugs.  RT at 136.
////

1    After Woodrow discussed the drugs with the Mexican man, White
2 started arguing with the Mexican man about paying for the drugs.
3 RT at 137.  The Mexican man then said, "I'll be right back."  RT
4 at 138.  Ten or fifteen minutes later, two African American men
5 arrived. RT at 139. One of them had dreadlocks.  RT at 139. The
6 other man was thin with short hair.  RT at 139, 170.  These two men
7 then went back to where the Mexican man was located.  RT at 140.
8 At one point Woodrow testified that he and White were then alone
9 in the office, RT at 130, but his later testimony suggested that
10 Dillard stayed in the office.  RT at 165.
11    Woodrow testified that the man with the dreadlocks returned
12 to the office.  RT at 140.  However, he later testified that both
13 of the African American men returned and the man with dreadlocks
14 said, "Break yourself . . . I want your money, all of it"  RT at
15 140, 141, 166.  The man pointed a gun at Woodrow's head.  RT at
16 142.  After the man took White's wallet, Woodrow reached for his.
17 RT at 144.  At this time, Woodrow heard the gun go off and felt
18 himself being shot.  RT at 144, 146.
19    A few months after the shooting, Woodrow attended a live line-
20 up.  RT at 149.  He was unable to pick anyone out.  RT at 154.
21    At trial, Woodrow initially identified petitioner as the
22 person who shot him. RT at 148.  When later questioned by the
23 prosecutor regarding whether he was sure that it was the man with
24 dreadlocks who had shot him, Woodrow testified that he could not
25 really remember whether it was the African American man with short
26 hair or the African American man with dreadlocks. RT at 153.

8

Woodrow also later testified that he was not really sure if petitioner was the man who shot him. RT at 153, although he remembered that petitioner was there that night. RT at 171. Finally he testified that he was not sure if petitioner was the man with the dreadlocks. RT at 171.

### 3. Todd Dillard

Todd Dillard testified that on July 14, 1998, White and Woodrow came to his girlfriend's house and asked him to buy them some methamphetamine. RT at 176. Dillard then went to Glenn Miller's warehouse at 222 Wilson to talk to Miller about getting the drugs. RT at 177. Glenn Miller went by the nickname "G." RT at 183. Miller agreed to help Dillard obtain the drugs. RT at 184. Miller told Dillard to stay at the building and he would go take care of it. RT at 184. When Miller returned, White and Woodrow arrived. RT at 185, 186. The four of them went to the office. RT at 186. Dillard heard White saying that he was not happy about the price he paid for the drugs. RT at 189.

At some point, two more people arrived. RT at 190. Dillard knew them as Ocean and Boo. RT at 190. Boo is African American, 6', 200 pounds. RT at 190. His hair may have been in dreadlocks that night. RT at 190. Ocean is 5'8" or 5'9", the same weight as Boo. RT at 190. Ocean was wearing a big dark Starter jacket. RT at 190. Dillard identified petitioner as Ocean. RT at 191.

Miller and Boo went up to the top bay of the warehouse. RT at 193. Dillard started to follow them and that is when he heard the first shot. RT at 193. Woodrow, White and Ocean were back in

9

the office. RT at 194. Someone else was there who Dillard did not recognize. RT at 194. Dillard's attention was drawn back to the office when he heard Woodrow saying, "You don't need to do that." RT at 195. Dillard turned around and saw Ocean dumping papers out of a wallet. RT at 195. At that time, Miller and Boo were still in the top bay. RT at 196. As Dillard turned to go back to the top bay, he heard a shot. RT at 196. Dillard turned around and saw Ocean standing with a gun. RT at 197. Dillard then heard one more shot in the office and possibly a couple more. RT at 197. Dillard attended a live line-up and identified petitioner, a.k.a. Ocean, as the man with the gun. RT at 209.

When Dillard spoke to the police on the afternoon of July 15, he told them that he thought Ocean had a gun in his hand but he was not sure. RT at 217. Dillard knew that Ocean had something in his hand but at that time he could not swear it was a gun. RT at 217. A day or two later he stated that he remembered that it was a gun. RT at 217. When Dillard first spoke to the police after the incident, he did not tell them what had really happened because he did not want to admit that there was a dope deal involved in the incident. RT at 238.

**4. Vallejo Police Officer Coelho**

Boo, whose real name is Charles McClough, was shot seven times shortly before petitioner's trial. RT at 25. As a result of the injuries he suffered, McClough was unable to testify at trial. RT at 34, 37. The trial court ruled that statements made by McClough to Police Officer Coelho following the incident were against his

1  penal interest and, therefore, admissible.  RT at 39, 381-283.
2       McClough told Officer Coelho that he went to 222 Wilson to
3  borrow money from Wilson.  RT at 318.  On his arrival, he saw
4  Ocean, Miller, Scooty, Todd Dillard and a heavy set white male.
5  RT at 319.  At that point, the heavy set white male began to argue
6  with Ocean.  RT at 319.  McClough, Dillard and Miller went into an
7  adjacent office.  RT at 319.  At this point, he heard a gunshot.
8  RT at 319.  Prior to that, he had heard Ocean accusing the heavy
9  set white man of being the police.  RT at 319.
10      The gun used in the incident was not found.  RT at 327.

**C.   ANALYSIS**

Petitioner argues that admission of McClough's statement through Officer Coelho violated the Confrontation Clause. Below I conclude that petitioner's claim is well taken.

In all criminal prosecutions, the accused has a right "to be confronted with the witnesses against him." U.S. CONST., amend. VI. "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of facts." Maryland v. Craig, 497 U.S. 836, 845, 110 S. Ct. 3157 (1990).  When the government attempts to introduce out-of-court statements of a declarant who is unavailable to testify, the court must determine whether the Confrontation Clause permits the government to deny the accused his usual right to cross-examine the declarant.  Lilly v. Virginia, 527 U.S. 116, 124, 119 S. Ct. 1887 (1999) (plurality opinion).

11

1    Respondent has conceded that McClough's statement violated the
2    Confrontation Clause under law in place prior to the present
3    Supreme Court term.  Resp't Mem. of P. & A. in Supp. of Answer at
4    5-6.  This term, the Supreme Court made that concession clearly
5    appropriate when it overruled Ohio v. Roberts, 448 U.S. 56 (1980),
6    and substituted in its place a bright line rule which forbade out-
7    of-court testimonial statements unless the declarant was
8    unavailable to testify and the statement had been subject to cross-
9    examination.  Crawford v. Washington,  541 U.S. 36, 68 (2004)
10   ("Where testimonial evidence is at issue, however, the Sixth
11   Amendment demands what the common law required: unavailability and
12   a prior opportunity for cross-examination.").  The bright line rule
13   was violated in this case.  Even if Crawford is not applied
14   retroactively to pending habeas cases, it highlights the propriety
15   of the concession under the prior, more permissive law.
16       As explained above, generally the standard utilized to
17   determine whether an error is harmless will depend on the state
18   courts' treatment of the error.  If the state court found a federal
19   constitutional error, and applied a federal harmless error test,
20   the habeas court reviews the effect of the error under the AEDPA
21   "unreasonableness" standard.  Medina v. Hornung, 386 F.3d 872, 877
22   (9th Cir. 2004).  If, however, the state court did not, for
23   whatever reason, apply a federal harmless error standard, the
24   habeas court must undertake an independent review of the record to
25   determine whether the constitutional error was harmless.  Pham v.
26   Terhune, 400 F.3d 740, 742 (9th Cir. 2005); Visciotti v. Woodford,

288 F.3d 1097, 1105 (9th Cir. 2002); Greene v. Lambert, 288 F.3d 1081, 1089 (9th Cir. 2002). In the matter at bar, the state courts did not apply the Chapman harmless error test, but rather a state law "reasonably probable" test. Court of Appeal Order at 5. Accordingly, the court will not give AEDPA deference to the harmless error finding of the state court.

Confrontation Clause violations are subject to harmless error analysis. Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986). Thus, this court must now consider whether admission of McClough's statement "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abramson, 507 U.S. 619, 637-38 (1993)(quoting Kotteakos v. United States, 328 U.S. 750, 776 (1956)).

The magistrate judge opined that because "the jury had sufficient evidence on which to find that petitioner shot Woodrow even without McClough's testimony" he could not conclude that McClough's testimony had a substantially injurious effect on the verdict. The test applied by the magistrate judge is not the proper one. Binding precedent holds that the court is not to analyze whether there was sufficient evidence to support the jury's decision, but rather should review whether the evidence which was erroneously allowed had a substantially injurious effect on the jury's assessment of the case. Mancuso v. Olivarez, 292 F.3d 939, 950 (9th Cir. 2002) ("the inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had

13

1 substantial influence. If so, or if one is left in grave doubt,
2 the conviction cannot stand."); Arnold v. Runnels, 2005 WL 2029557,
3 6 (9th Cir. 2005).[1] Under this standard of review, the court must
4 not look to see if the jurors were correct, but whether the error
5 may have reasonably had an effect on the jury's decision. Whelchel
6 v. Washington, 232 F.3d 1197, 1206 (9th Cir. 2000)(quoting
7 Kotteakos v. United States, 328 U.S. 750, 764-65 (1946)).

8     As the magistrate judge found, McClough's statement placed
9 petitioner at the scene as well as in the room with White and
10 Woodrow at the time of the shooting.[2] Moreover, it did much more
11 than that. It also served to remove McClough as one of the
12 possible suspects by placing him in another room at the time of the
13 shooting. RT at 319. There was other evidence which placed the
14 petitioner at the scene as well as in the room with White and
15 Woodrow at the time of the shooting. As discussed above, both
16 Dillard and Woodrow testified that petitioner was present, however,

---

[1] In conducting an independent analysis, the court is to avoid focusing on who carries the burden of proof. O'Neal v. McAninch, 513 U.S. 432, 436-37 (1995) ("we think it conceptually clearer for the judge to ask directly, "Do I, the judge, think that the error substantially influenced the jury's decision?" than for the judge to try to put the same question in terms of proof burdens . . ."); Mancuso v. Olivarez, 292 F.3d 939, 950 (9th Cir. 2002). But see Belmontes v. Brown, 414 F.3d 1094, 1139 (9th Cir. 2005)(holding that while the cases suggest that the analysis should be done independently, "the State normally bears responsibility for the error that infected the initial trial.").

[2] In finding the state law error harmless, the California Court of Appeal found that while McClough's statement placed petitioner at the scene, it did not directly implicate him in the shooting. Answer, Exhibit 8. I agree with the magistrate judge's finding that McClough's statement did implicate petitioner in the shooting because it placed him in the room with White and Woodrow.

14

1  Woodrow could not identify petitioner as the shooter. RT at 148,
2  153, 171. Woodrow also remembered that both the petitioner and his
3  friend, presumably McClough, were both in the room when he was
4  shot. RT at 166, 171. White's testimony also suggested that both
5  the petitioner and McClough may have been in the room at the time
6  of the shooting. RT at 68. Woodrow's testimony was that he
7  thought a man with dreadlocks shot him, or at least that he was
8  unsure whether it was the man with the short hair or the man with
9  the dreadlocks, which, based on other testimony, would have been
10 McClough and not the petitioner. RT at 140, 141, 144, 166. Hence,
11 the testimony of White and Woodrow together suggests that it is
12 possible that either petitioner or McClough shot Woodrow. Thus,
13 the testimony of Officer Coelho served a dual purpose, both placing
14 petitioner in the room in a confrontation with White and Woodrow,
15 and placing McClough outside of the room, corroborating Dillard's
16 testimony which is the only other testimony that has McClough
17 outside the room. RT at 319.

Welchel identifies a number of factors to consider in making the substantial and injurious determination, including: "the importance of the testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony, the extent of cross-examination permitted, and the overall strength of the prosecution's case." 232 F.3d at 1206; Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).

Here, the only evidence that clearly implicated the petitioner was Dillard's testimony. Neither White nor Woodrow was sure who

shot Woodrow, and their testimony is contradictory both to Dillard's and each other. Not only was the testimony of Officer Coelho concerning McClough statement corroborative of Dillard's testimony, it was also important because McClough was another person that may have been the shooter in light of the testimony by White and Woodrow.[3] Welchel further held that:

> While corroborative evidence may, as a general rule, make the wrongful introduction of other evidence harmless, this concept has no application where: (1) there was a reason for the jury to doubt the only eyewitness testimony; (2) the third party testimony was not exceptionally strong; and (3) the physical evidence connecting the accused to the crime was limited and explained by the suspect's claimed role of accessory after the fact.

232 F.3d at 1208. In the present case, the corroborating testimony is what should not have been allowed, but the general principle seems to apply equally here.

All the testimony places the petitioner at the warehouse at the time of the shooting, but there is only Dillard's testimony that firmly puts the petitioner in charge of the gun at any point. The gun was not found in this case so there is no physical evidence to tie petitioner to it. RT at 327. As noted above, other than Officer Coelho's improperly admitted testimony, Dillard is alone in placing McClough outside of the room at the time of the shooting. It is important to remember that Dillard originally told

---

[3] The magistrate judge found that there was no evidence that demonstrated that Dillard had any motive to lie. The absence of clear evidence that Dillard was lying, however, does not necessarily mean that the jury would have found Dillard's testimony fully credible, in light of his previous statements to the police, his involvement in the drug deal, etc.

16

the police a false story why he was at the warehouse. It seems unlikely that an explanation that he did not want to admit involvement in illegal activity would make Dillard's trustworthy in the eyes of the jury, and thus sufficient to resolve the doubt raised by Woodrow and White's testimony. Woodrow was the one who was shot and presumably would thus have the strongest motivation to testify credibly, and, as noted above, he had considerable doubt about whether it was the petitioner who shot him.

The jury heard at least three different accounts of the events that occurred on the night that Woodrow was shot. White, who was in the room when it happened, was unable to correctly identify the shooter in a photographic line up, in a live line-up, or at trial. RT at 78-79, 316. Though he was able to narrow down the possible shooters to the petitioner and another man, when pressed, he selected the other man as the shooter. RT at 316. Woodrow was initially able to identify the petitioner as the shooter, but later said he could not remember if it was the man with the dreadlocks or the short hair that shot him, but he thought it was the guy with dreadlocks, which would have been McClough. RT at 153, 171. Significantly, Woodrow testified that he did not believe petitioner was the man with the dreadlocks at all. RT at 171. At a live line-up a few months after the shooting, he was unable to pick anyone out. RT at 154. Finally, while Dillard's testimony places petitioner in the room holding a gun, Dillard himself was not in the room when the gun was fired and noted that there was someone else in the office that he did not recognize at the time. RT at

17

193-197.

While the testimony of White, Woodrow, and Dillard overlap in certain areas, they diverge at the key point of determining what actually happened at the moment that Woodrow was shot. In light of this, this court must find that the admission of Officer Coelho's testimony about what McClough told him had a substantial and injurious effect on the jury's determination of the case. Without it, the jury would have only had three different version of the events, the addition of McClough's testimony created one story line that was substantially confirmed by two people, and it is the one the jury apparently adopted.

In sum, the jury has to have found beyond a reasonable doubt that petitioner committed the crimes with which he was charged, and, in this regard, the unconstitutional testimony might well have influenced the jury's determination. Whelchel v. Washington, 232 F.3d 1197, 1206 (9th Cir. 2000)(quoting Kotteakos v. United States, 328 U.S. 750, 764-65 (1946)). Under the circumstances, this court is left with a "grave doubt" that the error in admitting the statements of McClough was harmless and thus cannot uphold petitioner's conviction. Belmontes v. Brown, 414 F.3d 1094, 1139 (9th Cir. 2005).

////

////

////

////

////

Accordingly, petitioner's petition for writ of habeas corpus is GRANTED.  The State shall commence proceedings to retry petitioner within thirty (30) days or release him.

IT IS SO ORDERED.

DATED: August 31, 2005.

/s/Lawrence K. Karlton
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT